on behalf of the appellant Steven Moreland. Your Honor, I'd like to reserve five minutes for rebuttal. All right. Mr. Moreland's case came to me as an appeal, which means my full first full introduction to this case was in reading the record. And I can only describe reading the record in this case as witnessing a train wreck in very slow motion. It seems like everything that could go wrong in this case did go wrong from the very beginning. It starts with Mr. Moreland waiving his right to counsel and going pro se based on a misunderstanding on the level of advice and assistance he would get from advisory counsel. It proceeds with Mr. Moreland mounting what could only be described as an unorthodox defense while incarcerated with inadequate access to a mountain of discovery. It proceeds with Mr. Moreland about a year later finally realizing he is not up to the task of handling this complex and lengthy case pro se and asking that counsel be appointed. It has something to do with his friend Mueller no longer being able to assist him, did it not? That's what the government has argued. I would say that you might see a closer temporal connection if that were in fact the case. Donald Mueller dies in January 31st, and it's in April, several months later, that Mr. Moreland finally throws in the towel. And I'm not sure how clear it is from the record. There were things going on with Mr. Moreland. He developed shingles. He was in care for medical reasons. So there were a lot of other things going on. But I know the government has made that argument that since Mr. Mueller was no longer available, Mr. Moreland finally agreed to bar appointed counsel. But the fact of the matter is that he did ask for counsel. And when counsel is appointed, he tells the judge, I can't be ready to take this trial. Mr. Moreland can have a speedy trial. He can have effective assistance of counsel, but he can't have both. And, in fact, Judge Rothstein says on the record, I wouldn't expect any attorney to come in and try this case with 60 days preparation. And that's exactly the amount of time Mr. Hurwitz had to prepare this trial for a case. Of course, he wasn't unfamiliar with the case. And it isn't as though somebody that had no familiarity with what was going on. It's somebody that was advisory counsel. But just barely, Your Honor, because on Judge Rothstein's instruction, Mr. Hurwitz did nothing to prepare for this case. Mr. Moreland repeatedly went to Judge Rothstein and says he's not doing what you told me he was going to do. He's not helping me. He's not giving me advice. You told me at my second Ferretta hearing that's what he was going to do. And, in fact, he did none of that. He did no more than prepare, not even prepare, than file, act as a sort of a clerical conduit for Mr. Moreland's pro se motions, which is exactly what Judge Rothstein over time told him that was all he had to do. So, yes, Your Honor, he was somewhat familiar with the case, but he hadn't been meeting with his client or with his standby client. And so, no, he really wasn't prepared. And I think it's important, Your Honor. Why did, once he was appointed counsel, and once he says to the district judge, you know, this is a complicated case and I'm not going to be ready if I have to go to trial on the current schedule, why was it not postponed longer? My understanding is that it was not postponed longer because Moreland wouldn't let it be postponed longer because he had this notion about a speedy trial. And where did he get this notion? He asked Judge Rothstein, can I continue my trial and still mount or still preserve my constitutional speedy trial claim? She says yes. And then she says, no, wait a minute, no. Wait, this is exactly why you need counsel. So his attorney then tells the judge, he prepared, he files a motion that is clearly prepared by Mr. Moreland, but now on counsel's letterhead that says, I don't want to waive my speedy trial right. And counsel says on the record, this motion is contrary to what I would ask for myself to get ready for trial, but Mr. Moreland has instructed me to file this sort of non-waiver of speedy trial. And under the speedy trial, here's where the problem comes in. Somebody should have told Mr. Moreland that he could have preserved his speedy trial constitutional claim on the facts. But more to the point, there are four people who can bring a motion under the speedy trial act to continue a trial. That's the judge, the defendant, defense counsel, and the prosecutor. It doesn't say that you need the defendant to consent. In fact, Judge Rothstein continued this trial repeatedly over Mr. Moreland's – over his agreement without violating his speedy trial rights. But it isn't where we are now in the continuance. There is this push-pull between Mr. Moreland and his counsel. Now, he has this counsel, and the counsel puts all this on the record, and the judge makes the decision. If your complaint is now that Mr. Moreland didn't really understand the parameters on the speedy trial options, isn't that an ineffective assistance claim and not really a question of abuse of discretion under the continuance? We've raised it as both. I understand. Yes. But I mean, in terms of realistically, in terms of given how it's presented here, he says, well, I might ask for more of the client. I'm, you know, here I am. I'm kind of in this dilemma. So here's where we are, Judge. And why, then, is that an abuse of discretion, just taking it at first as a substantive matter? It's an abuse of discretion because if the judge recognizes that no attorney worth his or her salt can come in and try this case in 60 days, isn't it upon her – and the Speedy Trial Act gives her the right to bring a motion. It says the court on its own motion can bring – can continue a trial in order to allow counsel to prepare for trial when the rights or the interests of the defendant in the public are outweighed by the – by the interests of justice. And it says she can also bring that motion to avoid a miscarriage of justice. And when we have a judge on the record saying nobody could be prepared to try this case in 60 days, and then proceeds to tell the attorney that that's how much time that attorney has, I would submit to you that is an abuse of discretion. And I – the court needs to keep in mind just the length and the complexity of this case. This case involves half a million pages of discovery, over 75 government witnesses, and it took close to – a little over seven weeks to try this case. By the time counsel was appointed, he had interviewed no witnesses. He had just gotten the Jenks material. He hadn't even started delving into the discovery. There were no motions in limine or virtually no motions in limine filed. In this case, I submit to you, it was right before a – an aggressive pretrial motions practice. None of this had happened. So I get – at that point, yes, we do get to an abuse of discretion. By the same token, we can look at it as an ineffective assistance of counsel. At some point, somebody should have set Mr. Moreland straight on this issue and should have said, you know, we can go ahead and do this under the Speedy Trial Act without your agreement. And you can preserve your constitutional claim for all it's worth. And we can still get a decent continuance. Trial counsel asked for a continuance into September, and he didn't get it. And the – this just – it continues through trial. Counsel goes to trial unprepared. And we know this by looking at the record. Mr. Moreland takes it upon himself to cross-examine the government's main witness because the attorney is not prepared to cross-examine that witness. Mr. Moreland prepares the defense exhibits, which the prosecutor describes on the record as incomprehensible. These are the exhibits that went in front of the jury. At trial, Mr. Moreland is repeatedly asked to comment on the veracity of government witnesses. He's asked, when Mr. Alvarez said this, was he lying? When Lisa Green said this, was she lying? Over and over, over again, without objection. In closing, the prosecutor, continuing with his theme that this is just a pack of lies and Mr. Moreland is just a liar, relies on that testimony without objection. And that's another issue. You can come to it as ineffective assistance of counsel. You can come to it as plain error. But it's just one more example of all the things that went wrong in this case and that could have been prevented. But it seems that it's harder, at least in the record as we have it now, to come out as ineffective assistance of counsel. There's a lot of claims raised, but we don't have the kind of record we would normally have to figure out what may or may not have been strategic and who said what to whom. So, you know, we're a little bit tight in that regard. Understood, Your Honor. But I would say under prevailing case law, I'm not sure what tactical reason you could ever have. There are some things, and this Court has recognized in some instances, the counsel's errors are so obvious that there could be no tactical reason. I don't know what tactical reason you would have for not objecting to clearly improper testimony along those lines. But granted, Your Honor, and I understand that's why we've also raised as a plain error under Guestin, which under that case you have the same situation, same kind of questioning, but in that case, it's prosecution, it's defense witnesses, not the defendant himself who is asked to do that, which I submit to you is far, far more prejudicial than just asking that of a defense witness. And in Guestin, this Court reversed under a plain error standard of review, saying this questioning is that questioning a defense or a defense witness about the credibility of the government's witnesses is plain error. And a couple of things that the Court looked at in Guestin was the strength of the parties' cases and the centrality of the credibility of witnesses to the case. And I submit to you that is exactly what happened in this case. Credibility was everything. It was the backbone of the government's case. It was the theme of their closing, their opening. All you have to do is read the government's closing statements to know that it stood and it fell on credibility of witnesses. And it's so we go through this trial, and all these things go wrong, and it's not until almost a year later, and Mr. Mullen has a new attorney, that somebody thinks to look into his mental health. And sure enough, he gets evaluated, and he's – it turns out he's suffering from a delusion that affected him at the time of the criminal conduct. And this is evidence that had counsel, trial counsel, been paying minimal attention to this issue, the attorney would have investigated, it would have been admissible at trial. In fact, it would have been reversible error for Judge Rothstein to have excluded this type of evidence had it been presented to her. And the mental health issue alone, I submit to Your Honors, should give this Court enough pause in deciding whether Mr. Mullen received a constitutionally adequate trial. That is information that would have been incredibly, incredibly valuable and would have played a big difference. What would the delusion have had to do with this whole scheme? Well, here's what it would have had to do with it. If you read Mr. Mullen's direct testimony, his attorney just kind of put him up there and let him go. He talks about the private economic system that exists, why he was doing what he was doing. He thought he was involved in a charitable venture that would help orphans and kids. And he really – that at his – that would explain a lot to the jury. As it was, they had no context in which to understand why Mr. Mullen did this. Why did he follow Mr. Zadar when he really didn't get a whole lot of money? When Mr. Zadar was arrested, he had cars, he had houses, and the other defendants – you know, Defendant Phillips had bought a ranch, a coffee ranch in Costa Rica. Mr. Mullen didn't have the kind of things you would expect somebody in this kind of fraud would have. He didn't have a bunch of nice cars. He had the car – the house that he already owned when he started this. And this would have gone a long way to explain to the jury, why is he going all over – all over the world and dropping $10 million here and trying to buy Chinese reorganization bonds? It made no sense as it was. And so that's why it would have been important to the jury. And it obviously was important to one fact finder. Judge Rothstein took his – his guideline sentence – at that time we were under the guidelines – from a life sentence down to 24 years based on this evidence. So if it was that important to Judge Rothstein as a fact finder, I think we can certainly – we can certainly say under the applicable standard, which is a reasonable probability of making a different outcome, that it would have made a difference. There's a reasonable probability it would have made a difference to the jury as well. Now, that's obviously part of an IAC claim. Correct. Is there – is it part of another claim that's more readily in front of us? I'm hesitant to get too deeply into IAC on a direct appeal. Is there – is there some way we can put that into some other framework than an effective assistance framework? If there is, I didn't come across any. But I don't – I understand we – this Court will rarely, rarely, and we should rarely argue ineffective assistance of counsel on direct appeal. But we need to look at why that is, because rarely is the record sufficiently developed. There's no more you need to know. What would an evidentiary hearing show in this case that would make any difference  You could ask trial counsel, well, did you realize that maybe he had some mental health issues? No. Well, if you look at the record, the government asked not for one, but two Feretta hearings, because it had some question about Mr. Moreland's state of mind. You look at the pleadings. You look at what went on in the record. And this case went on for – Well, now, the two hearings wouldn't have really had anything to do with his mental health, would it? The magistrates and Judge Rothstein were concerned that he knew what he was doing when he wanted to represent himself. Except let's look at the reason why the government asked for that second Feretta hearing. They said there's some things in his pleadings that they're incomprehensible, and it raises some issues as to the Feretta, as to his competency. I would say that – and that's early in the case, but we have a whole lot of pleadings from Mr. Moreland. We have a whole lot of history that at some point – I mean, obviously, sentencing counsel met him and said, wait a minute, there's something I need to investigate. It's not whether the investigation is fruitful, but we know that trial counsel didn't even investigate this. So here – how would that play out in an evidentiary hearing? Did you investigate this? No. And if you said, did you investigate, he says yes, and you say, well, why didn't you put it in front of the – in front of the jury, that would be ineffective  There's no answer that would render anything in there effective. It would render it tactical. So I submit this is one of the – But there's a little more information that might be useful. And I'm not sure how fully developed the ineffective assistance record would be on 2255, but one of the things I'd be interested on 2255 is, okay, let's do the investigation on mental health. Let's figure out as best we can how impaired he was, and let's figure out, then, as best we can, with that evidence, what that would have done. All we know now is that it wasn't done. And so the consequence of having done it is – we can guess at it. We can make a pretty good guess, maybe. But we'll know a lot more once we've actually had somebody, a professional, go in there and make the evaluation, done or not. But that's happened. And that's in the record. It was done for his first sentencing. There is a psych eval in the record that says that he was suffering from a delusional disorder at the time of the crime. But that's not been tested adversarially in the ordinary way you would do it under 2255, you know, because there's some reasons to think, well, you know, he was free from the influence of Mr. Zedar after a while, and he stayed with the delusions. I mean, you know, there are various things to be said on both sides of it. So, yeah. You sense my hesitation on that. I do, Your Honor. But we also have case law that says it's per se ineffective assistance of counsel not to investigate and not to put this in front of a jury because it would be reversible error to exclude it. Would you want to save the remaining time? I do, Your Honor. Thank you. Oh, if I may, just very quickly. If this Court does reach the sentencing issues, we obviously believe that this is more about a new trial. But just to give Mr. Friedman an opportunity to respond to this, if this Court does reach the sentencing issues, we would ask you to hold this case in abeyance until Rita and Claiborne and possibly McCarty are decided, because we have raised a reasonable issue under 3553A. All right. Thank you. May it please the Court. My name is Andrew Friedman, and I represent the United States in this case. This case arises from Mr. Moreland's conviction for participating in a massive fraudulent scheme, a scheme in which he, John Wayne Zadar, and others defrauded more than 2,000 investors of more than $73 million. Another panel of this Court has already affirmed Mr. Zadar's conviction in an unpublished opinion. This we we submit that this Court should affirm both Mr. Moreland's conviction and the 216-month sentence that he received in this case. Opposing counsel has described this case as a train wreck from beginning to end, and I don't think that's a fair description of the case. Certainly, it was an unusual case in some ways, but those are primarily because of Mr. Moreland, who he is, and what he did to the process as the case went forward. As the Court knows, from almost the very beginning of this case, Mr. Moreland sought to represent himself. As a result, there were two separate Feretta hearings conducted in this case. First, Judge Ralph – Magistrate Judge Benton conducted a hearing several weeks after Mr. Moreland was initially arrested, and she found that Mr. Moreland was capable of representing himself. Following that, there were some things that raised concerns with the government. It appeared that Mr. Moreland had his former business associate, Donald Muller, filing pleadings on his behalf, and pleadings that were hard to understand. The government asked for another Feretta hearing. Judge Rothstein conducted a second Feretta hearing, engaged in an extensive colloquy with Mr. Moreland, and found that he was capable of representing himself. She certainly advised him that this was a bad idea, that she didn't recommend it. She told him about all the disadvantages, but he passed the standard, and so she was required to allow him to do it. Now, opposing counsel has challenged this and said that this was an – the Court should not have granted this right to represent himself. And I think that claim doesn't hold water for a number of reasons. One is Mr. Moreland subsequently withdrew the waiver. He actually was represented at trial. Two, Mr. Moreland's counsel has suggested it was a conditional waiver, and so it was never a valid waiver. And that doesn't hold water, either, because, first, the initial waiver actually took place in front of Magistrate Judge Benton. It took place two months before the waiver that we have the colloquy of. And during – there's nothing conditional about that waiver. Sotomayor, the more troublesome point to me is once we have counsel appointed Yes, Your Honor. that we go so quickly to trial in a circumstance where it's obvious that his lawyer simply does not have time to prepare. Could you address that? Your Honor, we have – we certainly have Mr. Hurwitz's statements that he would like additional time, but what we have, because this case has gone to trial, is we also have the record of the trial. We have, first off, I should say, the fact that Mr. Hurwitz was involved in the case before that. He's not a brand-new lawyer coming to the case. He's familiar with the facts. He's had some familiarity, some involvement in working on the case. Had he interviewed any witnesses at the time he was appointed counsel? He represented he had not interviewed other witnesses. And do you take that at face value as a true statement? I have no reason to doubt that, Your Honor. There was a lot of preparation that a lawyer, given an appropriate amount of time, would have done that he, given the time frame, could not do. Isn't that right? I think lawyers might – many lawyers would have wanted more time to prepare. But what I was going to say is the second thing we have is we have the record of the trial. Almost any lawyer, wouldn't you say? What was the trial schedule? Did it persist for five days after five days after five days? It was typically four days a week. There was a July 4th in there. And my memory is with summer that usually four days, but maybe a third of the time, three days a week. So there were a number of days off during trial as we progressed. And what I was going to say is we have, in this case, we have not merely Mr. Hurwitz's statements in early May that had, like, more time. We have the record of the trial. And the record of the trial shows that he was very effective in trial. He presented the, I think probably the sole theory, the sole viable theory of defense, the only way that one could make a defense to this case, that Mr. Moreland had a good-faith belief in what he was doing. He presented that consistently in his opening statement through witnesses. And he did interview a considerable number of witnesses over time and presented a number of defense witnesses, which actually is relatively unusual in trials often. And through his closing argument, he made a, I'm sorry, made a closing argument that tied together the case and made the best argument, I believe, that was available for Mr. Moreland. He was also quite successful. He obtained acquittals on six of the 20 counts with which Mr. Moreland was charged. Mr. Moreland's co-defendant, Zadar, was convicted on all 25 counts with which he was charged. So I think if the Court looked, although Mr. Hurwitz would have liked additional time, if the Court looks at the record, the record establishes that he was prepared and that he did do a good job and certainly a job far above the level that would trigger any concerns about ineffective counsel. So that's the first thing we have. Well, yeah. I have to say that he was defending under less than ideal circumstances. And it sounds as though he did as good a job as could be expected of a skilled lawyer under the adverse circumstances under which he was operating. That doesn't quite answer the question as to whether or not he should have been given the amount of time that any lawyer would ask for in a case of this nature. This would be a very different case had Mr. Moreland and he asked for that time. There would still be questions about whether you give that time because a defendant who has insisted on keeping a lawyer out for a year and then asks at the last moment raises some questions. But in this case, Mr. Moreland, the reason he didn't get more time is Mr. Moreland didn't want that trial continued. He asked for more time. Judge Rothstein actually continued it a couple weeks over Mr. Moreland's objection. And so the reason that there was not additional time was Mr. Moreland's. And I think that's a very significant fact in this case. All of the parties in the system, the government, are in a difficult position at that stage because Mr. Moreland does have a right to a speedy trial. And ---- But you're not arguing that, for example, if the district court had said, despite your objection, I'm assessing this case and I'm determining that we needed a continuance of another couple of months. You're not arguing that he would have lost his speedy trial claim, are you? Certainly, he would not have lost his right in that case if he had ---- because he would have done exactly the same thing. Right. So you're saying he has a right to a speedy trial. He would not have lost the right to a speedy trial, nor would he have lost the claim had Judge Rothstein continued the trial for a couple months, a couple more months. That's correct, Your Honor. So your argument, really, that argument doesn't come into play. Although he might not have lost the claim, he still has a right to assert to a speedy trial itself, apart from the requirements of the statute and so forth. He has a right to insist on a speedy trial. Right. I agree. I mean, the whole point of the right is that if he wants to have his trial and he hopes to be vindicated and released from detention, that he's entitled to a trial. And he would have lost that right. So he just wouldn't have lost his constitutional claim here. The claim afterwards, yes. I take the point, yes. So, Your Honor, on the Ferretti hearing, I think that's not a viable claim, because I guess let me go back to the one last point. He initially waived his right to counsel at the first hearing. There was nothing conditional about that waiver. He did it in front of Judge Benton. So the second hearing in front of Judge Rothstein, he's already waived the claim in some sense. He's already waived the right to be represented and chosen to represent himself. So in some sense, that's really just a confirmation. But the second thing is, as you read the transcript, there is nothing in there that promises him a level of assistance that makes his waiver conditional on a certain level of assistance from counsel. In fact, the first approximately 15 pages of the hearing are a detailed colloquy about whether or not to waive. At the end of that, Judge Rothstein asks him clearly, do you choose to represent yourself? And he says, yes, I do. And then the conversation is very brief after that in which he says, now, you're giving me this point to stand by counsel. What can I ask him to do? But it's clearly a follow-up and looking for help rather than any conditioning. The second thing is the mental health defense in this case. The government in this case did address that on the merits. And we believe that the record in this case is sufficient for the Court to reject that claim on the merits. I won't go into that unless the Court would like me to. But it's certainly insufficient for the Court to grant the claim on the merits. There are all kinds of things we don't know. One of the things, I would like to see Mr. Hurwitz's file. It may be that Mr. Hurwitz did investigate this. It may be that there is a record, an evaluation in that file from another psychiatrist or psychologist that says this man is fit as a fiddle. It may be there are certainly questions about Ms. Hastings' evaluation. When this case was remanded for resentencing, the government asked to be allowed to conduct a mental health evaluation in order to address the evaluation that the Court had found significant at the first sentencing. We filed a pleading saying why we thought we should be allowed to do that. And one of the reasons was that Ms. Hastings had been found or there was a strong suggestion in a Federal case in Alaska that she had fabricated results and perhaps testimony. And we wanted to see the raw test data for her test. We obviously have considerable questions about it. But assuming that the Court does not reject the claim on the merits, these are all things that need to be developed in the record to understand did Mr. Moreland investigate? Did Mr. Hurwitz investigate? Did he investigate adequately? Did he have a good reason for his choice? And is there anything to Ms. Hastings' evaluation, things which both examining her evaluation and obtaining another evaluation will allow a court at some point in the future to look at? And so on that, we would argue that there is the record either the Court either can reject it on the merits or should say it's premature and allow it to be considered later. In terms of preparation, I've really dealt, I think we've discussed that in terms of the consequences of FREDA. But the record here, the record of the trial, shows that Mr. Hurwitz did present an effective defense. He's far above the constitutional standard. He presented a very good defense, one that was successful on a number of the counts. And so on that, there's also not a basis for it. That, again, would be something that would be premature to, for the Court to grant. In terms of the limitation on testimony, and this arises both as an ineffective assistance of counsel claim and a substantive claim, Judge Rothstein did not impermissibly limit Mr. Moreland's testimony. After he had testified for two days on direct examination, she asked his lawyer how much longer he wanted. The lawyer estimated half a day. She gave exactly that amount of time. He testified for a further half a day on redirect. So he had plenty of time. And the other significant thing is, despite the claim that there was a limitation, we still have no evidence or no reason to believe there's anything that he was restricted from doing that would be material. Mr. Moreland filed – we have two things in Appellant's brief here, one that he would have testified more about how he came to be associated with JWZR and the merger of Dexia. Second, he would have testified about his good faith. These are very general claims. They're things he had already testified concerning extensively. He testified more about those. There's no – one could always say I would have talked more about good faith. Mr. Moreland could talk at great length. Had there not been a limitation, he'd been allowed to talk as much as he wanted. We'd probably be done by now, but we might still be there. But there is nothing specific that has been presented. And Mr. Moreland and counsel have had five years now to develop – to bring forward some fact that he was precluded from presenting. And so, one, I think Judge Rothstein didn't exercise any restriction because she gave exactly what she was asked. Two, even if one were to say there was a restriction, nothing was kept out as a result of it, nothing material in any case. We've already addressed the continuance issue. In terms of prosecutorial misconduct, this claim seems to focus around questioning of Mr. Moreland on cross-examination about whether two witnesses had told the truth, specifically questions when those two witnesses said something, were they lying? And Mr. Moreland is relying on a case called Guestin primarily to say that's improper questioning. Guestin – I would say two things. One, Guestin doesn't really apply directly in this case. Guestin had to do with a situation in which witnesses were forced to say whether key government witnesses, police officers or agents, were lying. So basically, had to do with forcing witnesses to assess the credibility of law enforcement officers who are particularly important witnesses. These two witnesses were peripheral fact witnesses. And so it's a very different situation. It's also a different situation because Mr. Moreland's testimony invited that question. In the case of Lisa Green, one of the two witnesses, Mr. Moreland test – the answer – there was a dialogue going on, and before the word lying even comes up, Mr. Moreland says she testified to something that wasn't true. And the follow-up question is, she was lying? Even if one would wish it was phrased a different way, it's a natural response to that question. It's an answer you don't expect to get. Mr. Moreland has basically said the witness is lying before he's even asked the question. So that explains the testimony with respect to one. With the other witness, it's a witness – So you're saying that that's not trying to impeach the witness? I'm saying it's invited error. I mean, that – probably sort of a natural response in the give-and-take of cross-examination. Or accidentally invited error. Probably, Your Honor. Yes. But excused, I think, by the fact that it's invited. In the case of the other witness, it's a witness 1 to Dios Alvarez, and there is one question asked of him that basically Mr. Moreland had testified in a way that made it clear that his testimony was directly at odds with Mr. Alvarez's testimony. And there's one question asked, so are you testifying Mr. Alvarez is lying? It's one question in a seven-week trial of a peripheral witness. And so, first, I would say that it's not covered by Gaston because it's not a central person, it's not a government officer, all of those things. But, second, even if the Court were to find that that's a question that shouldn't be asked, it's one question in a seven-week trial that drew no objection that does not rise to the standard of plain error. There's also an argument that the government reinforced the error in closing argument, and that is not the case. There's no reference in the closing argument to saying Mr. Moreland testified that so-and-so was lying. Obviously, Mr. Moreland's testimony is put up against other people's testimony, but it's not reinforced. If this claim keys off the fact that that question shouldn't have been asked, that means that the error is not being reinforced in closing argument, rather, the closing argument is argument that is allowed and is proper under Molina and other cases from this Court. Would you, with respect to the sentencing, as Jordan has suggested, that if we got to that point, that we would need to wait for Rita and Claiborne? And I've read through the multiple sentencing, and so I'm a little bit perplexed exactly how those cases fit in to this sentencing, but do you have a position on that? I think it would be fine for the Court to do a – well, I think the sentence is fine under the Court. I mean, the Court, under the current case law or what is likely to happen, the Court resentenced this. Basically, the first sentence was vacated, remanded. The Court resentenced following Booker with an understanding that it was to look at all of the factors in 3553. Did that clearly, I think, has fulfilled what its obligation has given a lawful sentence, and it is an appropriate sentence, and I think the Court can resolve this case without waiting for those cases to be decided. I would like to make one point on the – I guess the last issue, which is the restitution issue. At the time that Mr. Moreland originally was sentenced, the Court did not order restitution. We – basically, this was a massive investigation with relatively uncooperative witnesses in most cases, and the question of figuring out what assets could be recovered and how those would be given out to victims was incredibly difficult. Now, we did recover approximately $25 million in this case, roughly a third of the money, and so people really did get back – in fact, some didn't claim, so they got back nearly half of the money that they invested and lost. Compared with that, the amount of restitution that any defendant ever was going to be able to pay was incredibly – incredibly small. If Mr. Moreland were to pay $1,000 of restitution, that's 50 cents a victim. And so the decision was made to rely on the receiver determining the value of claims and the relative value of claims, and to use that as the basis for a restitution order at whatever point that became available, if it became available in time. I think the scope of the work is shown by the fact that the final restitution list is, I think, 69 pages long in fairly small type. The receiver did not manage to do that within the 90 days. But I think the victims, in some sense, got lucky in this case, and the government got lucky in this case when the original sentence was vacated and the case was remanded for resentencing. They're arguing that it's jurisdictional. Nobody seems to have cited any cases, but the Outer Circuit cases would suggest that it's not jurisdictional. On the other hand, if we were to go that route and say it's not jurisdictional, is there any end point? Or can we say, well, what does 90 days mean? It's hard for me to draw that line. I think the Court doesn't need to in this case, because no one has come back years later and said, hey, you know, let's we'd like to come in now. The record has developed in a certain way that he was resentenced at a particular time because of his own appeal. And I would actually cite the case. Mr. Moreland's counsel submitted a Rule 28J letter with one case on point. For this issue. In reading that case, it actually cites another case, a Seventh Circuit case, Grimes. And I'll submit a 28J letter. But Grimes is an interesting case, because in that case, there was a restitution order that was improperly ordered. And what the Seventh Circuit did is it directed the district court to resentence the defendant for the sole purpose of allowing restitution to be entered, because it would have been untimely under the prior one. And so I think in this – I mean, that – I think that stands for the principle that when – I see my time is up, Your Honor. If he had not appealed the sentence, would it have been proper to enter a restitution order? It would have been a hard question, and we would have weighed very closely whether we could go in good faith to a court and say – I think we would have tried, and I think it would have been a hard question whether it was appropriate. Because the statute does have the 90-day limit, but there are ways around it. And one other question. You didn't address the mental health and delusional aspect. I didn't address the substance of that, just because the Court had suggested so much that it was premature. Would you like me to address the substance? Yeah. Okay. Your Honor, the diagnosis in this case was something called joint delusional disorder, which, as set forth in the DSM, apparently is you have a person, and they run into another person, and they develop a dependent relationship on that other person. And that other person has a delusion, and part of their dependency is they develop the same delusion. And so the argument in this case for Mr. Moreland was Zadar had a good faith belief that there's this world of high-yield investment, and when Moreland met him, he became co-opted into that same delusion. We laid out in our brief why that makes no sense in this case, because Moreland one, was peddling a high-yield fraud, Dexia, before he really had any significant relationship with Mr. Zadar. Two, it doesn't explain a lot of the conduct in this stage. It doesn't matter how much Mr. Moreland believes that there is this world. When Mr. Moreland stands up on stage and says, I've made so much money, I'm a millionaire, I'm retired, when he listens to people say, Dexia made $40 million last year, and he knows it's not true, that's not a delusion. There's no delusion that can explain that, whatever he thinks about the world of high-yield. And finally, Mr. Moreland continued that long, long after his disassociation with Zadar. In fact, shortly after this scheme was ended in May of 2000, he proves that he's disassociated, because he sends an email saying, I've discovered Zadar is a fraud, there's nothing to this whole thing, and yet he continues peddling high-yield investments, he comes to the grand jury and lies about things that are, again, can't be explained by a delusion. For instance, I went to Costa Rica just because it was the procedure when four other He told me that he knew about the search warrants. That's why he fled to Costa Rica. And so it's inconsistent with all of the evidence in this case. Thank you, Your Honor. To respond to a couple points, I hope the irony is not lost on the Court, that the restitution matter before the Court, but Mr. Moreland's trial counsel had to deal with the same information in about 60 days and go to trial. There was a full year between Mr. Moreland, the end of his trial, and his first sentencing, and there's no reason why the government couldn't put something in front of the Court, put some motion in front of the Court. And it is the fortuity of the fact that Mr. Moreland was remanded under Blakely that gives the government another chance to bring this before the Court. And then the out-of-circuit cases that we cited to you all involve a very different situation. That's where there was a restitution order entered, and there was something wrong with it. And on remand, they said, go ahead and fix it. There's not a single case that I could find, except that FAR, where they did it under supervised release guise, where the Court waits however, or the government waits however long they want to, and then tries to resuscitate the issue. And it's not jurisdictional, because there are ways around it, but this is not one way around it. They should have done it then. They should have preserved the issue, and they didn't. Mr. Friedman has said that the invalid waiver was subject to some sort of harmless error analysis, is what I hear him saying. And in fact, it's a per se error. If you find that the Feretta waiver was invalid, it was invalid for all time. There's nothing else that you need to do beyond that. Mr. Friedman has said that Mr. Hurwitz did a great job at trial. I don't know how you can square that statement with the fact that Mr. Moreland cross-examined the government's case agent about the financial information, and that he prepared his own exhibits. There were over 75 government witnesses. There is, maybe he interviewed them while the trial was going on, but there is no way somebody could have prepared that information and gone through half a million pages of discovery to get ready for a trial in that amount of time. He says that he presented the best defense. He had a good faith defense. Well, no, the best defense would have been good faith coupled with this mental health evidence. It wasn't in there. Had he had more time, you know, it could have been that he would have looked into this. He defends the government's questioning of the, what he calls peripheral witnesses. They weren't peripheral. Maybe they weren't mentioned by name in the government's closing, but they sure honed in on that theme over and over and cited that specific testimony to call Mr. Moreland a liar. The government suggests that Mr. Moreland sandbagged this, that he was sort of waiting in the wings, and at the last moment he asked for trial, for trial counsel. That's not true. He asked for trial counsel a full two months before the first June 10th trial date. This is not somebody who came in on the eve of trial and is trying to sort of manipulate the process and work the process. But even if that were true, he still doesn't have to pay by giving up effective assistance of counsel, because that is not something you can waive. Mr. Friedman touched a little bit on the substance of the mental health evidence, and he raised this issue about, well, we argued below that Mrs. Hastings, Dr. Hastings had done something in another case. Well, that was flatly rejected, and those are just allegations in counsel's pleadings, nothing more and nothing less. This is evidence that should have been investigated. Any trial counsel should have investigated and would have put it in front of the judge. It should have been in front of Mr. Moreland's judge, and it will be at the next trial, and Mr. Friedman and Mr. Blackson will have ample opportunity to test the contours of that information then. We would ask that you reverse Mr. Moreland's sentence, remand for a new trial without the money laundering counts, and in the alternative, we would ask that you hold this case in abeyance on the sentencing issue. Thank you very much. Thank you. Thank both counsel for your arguments, very helpful. The case of United States v. Moreland is submitted. We're adjourned for the morning.
judges: Hug, McKeown, W. Fletcher